Wood, J.
There has been a mass of testimony taken in this case, too voluminous to be recapitulated at length, and will only bo referred to in general term3 in the disposition of the case. In this class of cases it is well settled that the auctioneer is the agent of both parties, and that sales of this description must be conducted in the utmost good faith; and the bidder, as a general rule, has the right to rely on the printed conditions, or verbal representations made by the auctioneer; and if they are not substantially true, it is a fraud upon the purchaser, and he is not bound by his bid. It is also true that a court of equity looks beyond the letter, and inquires after the intentions of the parties. Charles Shultz was, at one time, the owner of this property, and had assigned it to the complainants for the benefit of his creditors. At this time of the sale, and before and after he purchased, Ohesseldine occupied it under a lease from the complainants, as assignees, and paid the rents occasionally to Charles Shullz. He must, ^therefore, have known to whom it belonged, and that Charles Shultz was acting as the agent of the complainants in the management of the premises; and looking, then, at the transaction in its real light, equity would regard the contract as between the complainants and defendant, notwithstanding tho auctioneer erroneously made Charles Shultz a party. The correction of mistakes is one of the peculiar jurisdictions of a court of equity. It appears to us, also, the memorandum of the sale, signed by the defendant, through the agency of the auctioneer, if we regard the complainants as the real parties, takes the case out of the operation of the statute of frauds.
It is certain the property was incumbered at the time of the sale by the mortgages referred to, and until the July term of the superior court succeeding, and that a suit was pending in favor of certain creditors of Charles Shultz against the complainants, as his assignees, to set aside the assignment of this property; but at *107 the July term, by consent of the Bank of the United States, the creditors and assignees, such proceedings were had that the title was confirmed in the assignees, and the avails of the property disposed of'by the decree, leaving it perfectly in the power of the assignees to make a good title. It is very clear if Chessoldino had chosen to abandon the purchase, at any time after the ten days had elapsed, in which the title was to be made, his right to do so could not have been questioned. But if he chose, on his part, to consider the contract open, and to waive the limitation, within which the complainants were to convey, and until it was in their power, equity will estop him from afterward setting up their default as a defense to the suit.
If he treated the bargain as open and subsisting until, the bill was filed, and the complainants were able to make a good title at the hearing, performance, on the part of the defendant, will be decreed. 2 P. Wms. 630; 1 Atk. 12; 3 Cow. 445, 555. It is also certain if the printed conditions of the sale, or the representations made, are not true, the purchaser may waive his right to abandon the contract, and he will, in that event, be compelled to perform it. Does not the defendant ^occupy this ground? Griffin Taylor swears that the defendant offered to sell him the property three or four weeks after the purchase. Fox says before he commenced this suit, which was on November 25, 1839, ho had several conversations with Ohesseldine. He at first expressed a willingness to take the property, but at last objected to the title, and in October, or early in November, deponent tendered him the deed of the complainants. It is proved by Mr. Chase that in June or July the defendant agreed to pay for one-half of a partition wall, to separate the premises in controversy from those of the deponent, in the event of his completing tho purchase. There are other facts also in proof, which altogether lead us to the conclusion that the defendant intended to take the property until about the time when the deed was tendered, in October or November, long after the title was complete in the assignees, and the cause of his refusal was then, probably, not so much from any objection to the title as the depreciation in the value of real estate, which is shown to have been at least twenty-five _per cent, from May till October, 1839.
Another ground of defense is, that the complainants’ deed was but a quitclaim, which the defendant was not obliged to receive. *108 Whether this was a compliance with the contract, on the part of the complainants, must depend on its terms. The contract was for a good title. If, then, the assignees had the title, it would pass to the defendant by a quitclaim, as well as by a conveyance with covenants of warranty. The form of the conveyance, under such a contract, can not be material. The court will look to see if a good title is conveyed, and if not, whatever may be the form, the vendee will not be decreed to execute the contract, on his part. This deed, however, does contain covenants of warranty, by the assignees, against their own acts; but without even these covenants, a majority of the court would consider this conveyance sufficient to satisfy the terms of the sale. Decree for complainants.